Good morning, Your Honors. Kylie Grumbacher of Bradley Grumbacher on behalf of Appellant. I'm going to endeavor to reserve four minutes for rebuttal. Very well. May it please the Court. Let's start with what I think will hopefully be uncontroversial, and that is that we should all wear sunscreen. The FDA, medical authorities, the CDC, the American Academy of Dermatology all recommend that consumers wear sunscreen daily. The FDA says that an SPF of 15 sunscreen can help reduce the risk of cancer. They direct that the product should be used daily, applied liberally, and reapplied frequently throughout the day. Plaintiffs, like reasonable consumers, wanted to prevent cancer. And so, between 2017 and 2020, they got this well-founded guidance and purchased numerous of Apelli's premium-priced carousels. I think we understand the facts. Here's my question. I just want to make sure that I understand what you're saying. I read the complaint is that the plaintiff is saying that their injury, in fact, is that they paid money for Venenova, and that she would not have bought that had she known that it contained benzene. Is that a fair way to assess the argument? That's absolutely it, Your Honor. She purchased the product, and it is an overpayment area of recovery, and it's twofold. One, that the presence of benzene in the product diminished the value, because it's a chemical she wanted to avoid, and any reasonable consumer would. And two, the lack of certainty regarding the presence of benzene also diminished the value, because, again, it's a chemical that a reasonable consumer would simply want to avoid. I think the critical point here is that the injury has already occurred. The purchase is the injury. There is no contingency that we're waiting to see may or may not come to bear. The fact that this attribute at issue goes to health and welfare doesn't transform this case into a personal injury tort case, nor does it provide any justification to graft personal injury causation standards here to establish the elements of Article III standing. If anything, it goes to materiality, but that has nothing to do with Article III standing. You've got to show injury, in fact, though, part of your standing, right? That's right. All right. Now, what case do you rely on to show there's any obligation on, say, I'll just say Banana Boat, to disclose that benzene was an ingredient? So, I mean, I think that's a question of fact, but we would look at the FDA regs, right? If there is a deleterious substance, then there is a duty to disclose it. Well, I think that the FDA guides say if it's less than two parts per million, it's okay. Well, it doesn't say there's no duty to warn. I mean, even if, so a couple of things. It doesn't say that, no. There is no express language that says that number is safe or that it doesn't require a warning. What it simply says, in fact, the district court acknowledged that this was a disputed issue. It acknowledged that there was really no express language, simply that the guidance inferred or suggested and then the court inferred that that was a safe level. But even if that was true, even if it was a safe product to market, that doesn't mean it doesn't need a warning. I mean, drugs come every day that could have adverse effects. They go to market, but they require a warning. We see those all, I mean, we've all seen these, right? The drugs come. You can buy it, but it may kill you. It may cause gastroparesis. It may cause any of these adverse effects. The important thing is the consumer knows at the point of sale, and they can make a decision about whether they want to spend money on that product or purchase an alternative product. One part per million is a tiny, tiny little amount, right? It sure is. But what's important is to look at the entire record here, right? And what I was getting to in the beginning, in the pitch and the lineup, is that people use this product a lot. You're supposed to use a liberal amount. You're supposed to reapply it. This isn't a product you might take once, and then next cold season you take it again. You're supposed to put this product in the cart. Let's go to his question because I think it's an important question to get to. So, as I understand it, the ICHQ3C, that's the relevant authority here that says that benzene should not be employed in the manufacture of drug products because of its unacceptable toxicity. And then it goes on to say, however, so it says should not be used. Then it says, however, if it's unavoidable, that's the language it uses, unavoidable in order to produce a drug product with significant therapeutic advice, then benzene should be restricted to two parts per million. That doesn't sound like it's endorsing the idea of using this product. Sure. So, first of all, I think it's a factual question of whether that safe harbor applies because we know it's not necessary for the manufacturer, right? So the first problem we dispute. We also dispute that there's a therapeutic advance. And, in fact, there's guidance from the FDA that's come out where they have interpreted that as specifically not applying to sunscreens. And it's in the supplemental materials that we sent to the court. But I think the other thing is even if you look at that and you look at the guidance that defendants and the court relied on, one thing that the court says, it gives a proviso, and it says, in small amounts over long periods of time, benzene can decrease the formation of blood cells. Long-term exposure of benzene through inhalation, oral intake, and skin absorption may result in cancer such as leukemia. There's nothing to suggest that there shouldn't be a disclosure here. There's nothing to suggest that the value of the product wasn't diminished, that she didn't overpay. The safety of... Are there any sunscreens manufactured at all that contain no benzene, or do we not know that? There are. There are. So this case concerns aerosol products, but there's no indication that lotions don't. And, in fact, there are aerosol products that do not contain benzene. Is it benzene actually an ingredient, or is it just part of the manufacturing process? It isn't. It isn't. We don't know, right? So these cases are difficult because all the facts are within the control of the defendant, and they have no obligation to share them outside of litigation. But what we do know, based on the recall that defendants did, is that they believed that there was something having to do with the propellant. And so all of these involve the same propellant, and so it could be that it's an issue with the propellant. But it's certainly not necessary for the manufacturer. Sorry, no, that's okay. I was confused when you said that it was in the supplemental filing. That indicates what exactly? So there is an alternative located, I think it was one of the supplemental authorities that we filed, and I'll get to the docket number when I come back. But it's guidance from an individual within the FDA who is planning as to how he reads the regulation. And certainly other courts have looked at this exact guidance and read it the way that we do, right? So we know in Clayer v. Edgewell, the court in the District Court of Connecticut didn't read the guidance the way they wanted to be our friends on the other side. What they said is that that's actually irrational, because what you're saying is, if it's something necessary to produce, you can't use it unless there are certain caveats. But if it comes in as a contaminant, then it's wholly acceptable. And the court there said you can't really square that together. It seems like an irrational way to read it. I think the other issue here, though, is that what we're doing is we're getting into what is, I think, unarguably a merits-based issue. And the way that I read this court's controlling authority is that that type of merits-based analysis at this stage of the litigation is improper. And so I would call the court to Carolla v. City of San Francisco, where the district court, where the Ninth Circuit said the district court seems to have improperly conflated plaintiff's standing with whether she would prevail on the merits. Our threshold inquiry into standing in no way depends on the merits of petitioner's contention that conduct is illegal. It is a factual challenge, so the court certainly can consider outside authority. But we think Dreyer says that when they do so, they should resolve all disputes in favor of the non-movement. That certainly wasn't done in this litigation. Right. So you're advocating for more of a summary judgment type of standard, correct? That's what we believe the law is in this circuit. Okay. And you believe that because here really we're dealing more with not just sort of a facial attack at the standing, but really delving into the merits, correct? That's right. Absolutely. I mean, I think it's very clear in the Ninth Circuit that when you're determining whether a practice is deceptive, fraudulent, or unfair, that's a question of fact. And that's essentially what they're doing here. How reasonable is this? Is this deceptive? Is this unreasonable? And so, yeah, we think that the court should have not weighed the issue. If it weighted, it should have given the inferences to the appellant. But regardless of that, even if it was safe, we don't think that mandates dismissal because we think there's still Article III standing on the omission part of this. What exactly did Banana Boat misrepresent? So the misrepresentation is primarily, in truth, an omission case. There are a pretty integrated marketing campaign where they talked about testing and safety and reliability, but I think at base, ultimately, this is an omission case. They failed in your view. They should have, but didn't disclose that benzene was an ingredient, even though it was a teeny, teeny little bit. Well, we don't believe it's a teeny, teeny little bit, right? We believe it's material because of the way this product is used. And we cite medical authority to support that. We have a dermatologist out of Yale. We don't think that this is a small amount. So you're saying really two things. Number one, it's an omission and that it should have been in the ingredients list. That's number one. Number two, you're saying that it's unsafe. Well, I'm not sure that it needs to be in the ingredient list. What I think it needs to be is disclosed, right? So maybe an asterisk, may contain, or like any drugs, here's a potential adverse side effect, may contain. And you're saying that because it didn't contain it, that's your economic injury. Correct. Because plaintiff couldn't evaluate at the point of sale, right? But you don't have any authority indicating that they are required to have that, do you? I would submit that the FDA regs would support that. Well, where in the FDA regs does it say that you have to include that information? It says that you have to warn consumers about deleterious substances that may be. . . Well, there's a couple things. Under Wild Horse LaVon, the manufacturer bears the duty to control its label. And where there is something that could cause a harm to the consumer. . . That's the whole point. They're saying there's no possible harm. Go back to my question. Sure. Which is, what authority do you have saying that the FDA, or somebody else, says that they are required to have this on their label? I guess that's the question. I don't think the FDA has published any guidance yet on this issue. We know that they're looking at it. In fact, that's what their guidance says. The answer is no. The answer is nothing. I can point you to other than their guidance that in small amounts over long periods of time. I got it. And I think that that supports what the reg requires. But there isn't a case on point where that's been decided. Clinger v. Agiwell would be the closest. . . Well, not only not a case, but there's no regulation, no rule that says that they are required. At present, there is not. It is not part of the monograph. And all the other guidance is in process. The other claim is, though, that what the advertising says the product is safe, and you're claiming it's not really safe because of your Yale professor. No amount is safe. That's not the only authority we cite. But I think the FDA guidance says no amount is safe, right? It says that the dose and your comorbidities are all important factors. I mean, we're not talking about safety here. I think this is the big problem, is that the fact that it goes to safety doesn't mean we have to prove. . . The fact that it's an attribute, that it's a chemical, that it's unwanted, is what's important here. If I said made in America is important to me, and it turns out that it's not. . . That shirt's still a shirt, right? But it's an attribute that I think, as a reasonable consumer, diminishes the value. Same here. If I want Dolphin Safe tuna, and I pay for it, and I eat my tuna, and it's gone, and it was tuna, but it turns out later that it's not Dolphin Safe, there's a harm there, because there's an attribute which, at the point of sale, diminished the price of the product. This is the same as the case before us. The question is, is there something reasonable consumers would want to know, or have it defended as a duty to disclose, that was material that would have affected whether they purchased the product or the amount they paid for the product? We're getting into this. And this is what happens with all these courts, is that they draft these personal injury standards. You have to prove it's safe. Well, if I don't want sugar, and I say something's overvaluing the amount of sugar, I don't have to prove that it's going to cause me diabetes. This isn't a medical monitoring case. This isn't a cancer case where I say that it caused cancer. What I'm saying is, I wanted to avoid a cancer-causing chemical. There's nothing in the record that disputes that this is a cancer-causing chemical. And I would not have purchased this product, or I would have paid less. Now, whether I win or not doesn't establish whether I have standing. It's simply that this, like any other economic injury case, I paid money. I tested the product. It had the attribute I didn't want in it. I have standing. Whether I win or not is a question for later. It doesn't have to make me sick. It just has to be something a reasonable consumer would not have paid for had they known. And I also think the fact that the court requires testing is wrong. I also think that this idea that it completely kind of didn't even look at, which is, is the risk enough, was wrong. I mean, it doesn't even have to contain benzene, right? It could just be the fact that I have, when I come to the point of sale, a real and true and evidenced risk that the product contains something I don't want. So what I have paid for. Just one second, counsel. Judge Gould, do you have any questions right now before this counsel? No. Okay. All right. Do you want to reserve the floor? I do, please. Thank you. Counsel. Good morning. Good morning, Your Honors, and may it please the court. My name is Megan McCurdy, and I represent Appalese. And we are asking this court to affirm the district court's dismissal of plaintiff's second amended complaint on grounds that she failed to allege a particularized injury sufficient to satisfy Article III standards. We'll get to her final argument, which was, hey, I wouldn't have paid for this product had I known that there was benzene in it. So she needs to allege a particularized injury to her. So the answer is twofold. The California case law and even the Ninth Circuit recognizes and interprets FDA guidance. We see that with Manuka honey to some degree, some significant degree. And the FAA was opined through its ICHQ 3C, the 2021 guidance and the 2022 guidance, that it has established a line of demarcation for the presence of benzene in sunscreen products at two parts per million. The judge included. It doesn't really say that, though, does it? I mean, it says – well, let me get to the language, because I thought that language was very helpful in understanding what's going on. Your Honor, I'm happy to walk you through each piece of guidance. So the ICHQ 3C, the 2009 guidance cited by plaintiffs, states – talks about – it discusses acceptable amounts for the safety of the patient. We focus also on the introduction in addition to the paragraph you cited. It does, in fact, discuss manufacturers should not use or should not employ unless it's unavoidable. There's a therapeutic advance, and the resulting benzene is less than two parts per million. The should avoid is the kind of language I'm – It's strong, Your Honor, but to be clear – Should avoid. But to be very clear, they've come before you right now and inserted a manufactured factual dispute. Nowhere do they allege, nor can they, that plaintiffs – that defendants intentionally use benzene in the manufacture of their products. If you go to paragraph 82 – You mean you're saying they have to allege that it was intentionally used? Well, if they want to – You think that's our flaw? If they want to focus on – if they want to focus on enforcement of this particular provision, yes. In paragraph 82 of their second amended complaint, in the record at page 459, the best they argue is defendants knew or should have known that their products may contain benzene or contain benzene. That's a conclusory statement. There's no facts to support it, and in any event, that's suggestive of a negligent standard. They don't allege. They want discovery with the hopes of one day alleging that they have standing. But to suggest that that applies here when they haven't alleged any intentional use by defendants, it's just not – it's not been plausibly planned. We can talk about whether the incidental presence of benzene in the guidance. That's kind of a different question. But to be very clear, they haven't directly alleged that defendants purposefully employ benzene in the manufacture of their products. I'm not sure their claim is, I wouldn't have bought this had I known that there was benzene. So that goes to harm. So do they have harm? And then the analysis is twofold. When they allege, I would not have otherwise purchased this product, they can establish that in two ways. One, plaintiffs are required to plead that the product substantially increased their risk of harm or there was a substantial probability of harm. That's a Harrington case. Or in an economic law standard, that the purchase of the product is as effective or unsafe. I don't when the FDA says should not be employed, should not be employed in the manufacture. That's a should, not a may. Should not be employed. And then it says that if it's unavoidable in order to produce a drug or product to improve. Is there some? Yes, Your Honor. It's the later guidance. And so when I'm speaking of the ICH Q3C guidelines, it does in fact say exactly what you're explaining. Should not use or should not employ. It must be unavoidable unless there's a therapeutic advance and it's under two parts per million. If you look at the 2021 guidance issued by the FDA and the 2022 guidance issued by the FDA, what the district court did in this case is read all three pieces of guidance together. And it's very clear in the 2021 guidance that the FDA was talking about a two parts per million limit for the incidental presence of benzene. That 2021 guidance, it does refer to the ICH Q3C. It references it. But it goes on to discuss the incidental presence. And then it instructs, the FDA instructs manufacturers, do not release any product containing benzene over two parts per million. And instructs manufacturers to contact the FDA for recall if they released a product containing more than two parts per million benzene. The 2022 guidance mentions something similar. What is clear when you take together, which is what the district court did, the three pieces of guidance. And while an FDA statement from an employee, an employee of the FDA, while that statement is out there and doesn't weigh as heavy as issued guidance, it is also consistent with the district court's interpretation of the ICH Q3C guidance, the 2021 alert, and the 2022 guidance issued by the FDA. And that is, it recognizes the incidental presence of benzene for reasons like contamination, for example. And it sets the limit at two parts per million. Even the court in Klinger said the FDA has determined that two parts per million of benzene in sunscreen is safe. We all recognize that manufacturers. Yes, Your Honor. I'd like to interject a question or two. Whether it's safe or not would be pertinent to a decision on the merits of the product. But I thought the only issue here in this case was whether there was standing. And if the plaintiff says, I wouldn't have bought the product if I had seen this disclosed, that's an economic injury. She either wouldn't have bought the product or would have paid less for it.  Say he can't dismiss for lack of standing. Will the case proceed to some evidentiary phase? Your Honor, the answer to the question is there's more to that. You can't just establish a particularized injury by saying, I would not have purchased the product. Why not? Do you have a specific case that says that? And to add to that, how then would you distinguish Enojos versus Kohls? Were there the courts that plaintiffs contend that they paid more for the product than otherwise would have paid or bought it when they otherwise would not have done so? If they claim that they have suffered an Article III injury, in fact. I distinguish. There are several buckets of cases where District California Courts just sort of skip over the analysis of standing. They do accept and or don't explain the underlying risk of harm. Enojos is a 9th Circuit 2013 case, Counsel. That's a 718F31098. Your Honor, candidly, I'm not summoning the case to my mind right now. But what I can say is that Kohls case where they said, hey, we're saving you 90%, but it wasn't really true. I think what is happening is the question is, is there an underlying risk of harm? So if I spend a quarter for this pen and it's a blue pen, but I really wanted a black pen, was I misled? But the underlying risk of harm has to be something meaningful. But you didn't answer my question. I asked you if there was a case that supported your position that you couldn't establish standing just by your say-so. I wouldn't have. Yes. Off the strike. Your Honor, I am. You've lodged into the merits whether the product's safe or not. But all we're doing with you is a motion to dismiss for lack of standing. I think, Your Honor, if you look at the Boyson case, that is the heavy metal fruit juice case, economic injuries insufficient to establish standing with the alleged level of toxin falls within the FDA advisory guideline. In that case, the district court interpreted the FDA guidance on acceptable levels of heavy metals in fruit juice. So I would start with Boyson. I would then also look at the Harrington case involving an allegation that. Is it Boyson? Is that a state law case? No, that's a Northern District of California case from 2012. The Harrington case is a Northern District of California case from 2010. The allegation was these bath products contain carcinogens. I wouldn't have otherwise purchased these products had I known they contained carcinogens. And plaintiffs pled that scientists there believe there's no safe level of exposure to a carcinogen yet. The court reasoned the district court held plaintiffs did not plead the amount of substance here caused harm or created a credible risk of harm. The court reasoned the FDA had found the same chemicals could be used safely in cosmetics. So there are multiple California cases finding that when there is an FDA level of acceptable, one doesn't have standing, I would point to Boyson and Harrington. Francesca, I don't know if I agree with your position that it indicates that it's acceptable. The language seems to suggest otherwise. But those are the cases that you are to answer Judge Gould's question. Those are the cases. So to answer Judge Gould's question, simply alleging I paid money for something and I wouldn't have otherwise bought it is not enough. That is akin to a statutory California standing case that you see in Quitset, for example, or Hinojo. What we have in Article III standing is you must articulate an underlying risk of harm. And in the context of this case, the question is, is purchasing a bottle of sunscreen that, taking all facts as true, contains .29 parts per million benzene in it in light of the FDA's guidance that the limit is two part per million for incidental use, means there's harm? And the answer is there's no underlying risk of harm. Well, you know, I don't know. I like brushing my teeth. And I get up in the morning, I grab my toothbrush, I put toothpaste on it, brush my teeth with it. But I really hate fluoride. What if I really hate fluoride? And it doesn't say in the package that it has fluoride. I mean, would that person say, hey, I don't like fluoride, but don't I have Article III standing for that? No, not unless, as the court explained in its order, harm has been established by alleging there was a substantial increase of harm or that the product was defective or unsafe. Those are the two theories under which we rely on. But I wouldn't have bought that if I had known it had fluoride. There's no harm, however. There's no underlying risk of harm. So the incidental presence of a safe trace, what you're essentially doing there is requiring manufacturers of any consumer product ever to identify any potential trace. Consumer products, cosmetics that you just mentioned, they're not made in hyperbaric chambers. It would be requiring every manufacturer to identify forever every potential risk of any potential trace, anything that's in a product, inadvertently. And the 2021 and 2022 guidance here on benzene talked about incidental presence. I mean, you're not talking about inadvertent presence of benzene. You're talking about an infinitesimally small amount. But they're plain as allegations at the World Health Organization. As an advisor in the Yale professor, you're saying no amount of benzene is safe. That is a factual dispute. That prevents us from deciding as a matter of law that what you did here is safe. It's no different than the Harrington case, Your Honor, the Northern District of California case, where there was a general allegation that there are carcinogens in these bath products and I wouldn't have otherwise purchased them had I known they were present. And I think it's important to go ahead and focus on what plaintiff did plead. Right? So plaintiff did plead generalized statements that benzene is a carcinogen. We do not dispute those statements. It did cite a letter authored by Dr. Butnik. And Dr. Butnik said, there's not a safe level. There's not a safe level. He said that. But it was in the context of he also saying .1 parts per million could expose people. And the district court specifically found that to be speculative. And then there's also a reference to a NIOSH standard, which is in the context of a general industrial hygiene practices, an EPA drinking standard that was not applicable. And these citations are in the second amended complaint in paragraphs 18 through 26. But ultimately, plaintiff's injury remained too speculative in light of the FDA's guidance. California law is replete with instances where a court has, even if hard, interpreted what FDA guidance means. And here the FDA has said the incidental presence or contaminated presence of benzene under the level 2 parts per million is safe. It's acceptable. But then somebody else says no level of benzene is safe. So how do we reconcile that at the stage of just do you have standing or not? Or does the plaintiff have standing? As opposed to summary judgment. As the courts did in Boyson and Harrington. There were very similar allegations present. Those are both district court cases. Correct. I would also point out. And then a Hoss is a Ninth Circuit case. The case that escapes you right now. It wasn't a trace benzene case. It was a marketing scheme. And certainly I'm getting it mixed up with the Hinojo case, which was the price marketing scheme. What I can offer you here is that these courts have recognized safe levels as stated by the FDA and held that there's no standing. Because there's no underlying risk of harm. The Corinthale case is a Third Circuit case. And it did involve the absence of regulations, but an FDA report. And there the plaintiff alleged I wouldn't have purchased this cosmetic, this lipstick had I known it contained lead. And there the Third Circuit relied on the FDA's report that held that this particular level of lead was not dangerous. As such, that plaintiff did not have standing. There was also the district court, again, a Northern District of California case. The Hells v. Curric case. Plaintiff failed to plead the product he purchased contained violated arsenic levels. And that, too, referenced a particular arsenic standard. My counsel, are the cases that you're relying on for saying there's no standing, are they cases that said there was no standing on summary judgment or on granting a motion to dismiss? They're standing decisions, Your Honor. They're Article III standing decisions, the Boyson and the Harrington cases. But were they issued as part of a summary judgment in your case? They were issued affirming a dismissed complaint. Correct. They were district court decisions dismissing a complaint on grounds that Article III standing was not present. Judge Cole, do you have any additional questions? No. Thank you. Thanks, counsel. Thank you, Your Honors. We respectively request that this panel affirm the lower court's decision dismissing the Second Amendment complaint on grounds that particularized injury did not exist and thus Article III standing did not exist. Thank you. Thank you. I don't have a tremendous amount to add. I don't think that the court should depart from well-settled Ninth Circuit authority here simply because the product-attributed issue has to do with safety as opposed to some other quality or characteristic. The practical application of what the district court did here is that a plaintiff has to proceed essentially to a bench trial on the merits without the protections of Rule 56, without any discovery, particularly against the backdrop of evidence that is largely solely within the defendant's control. This simply cannot and has never been the case in this circuit. What we've done here only further establishes that this is a merits-based issue and that we are weighing it and that that is under Ninth Circuit authority improper at this stage of the litigation. The cases that the defendants relied on at the district court, the district court looks at, typically are where the FDA has some fact-finding. There's no fact-finding here. There's interim guidance. And within that guidance, the FDA says, even at low doses, this is a dangerous product. Nobody disputes it's a carcinogen. So it's reasonable that a consumer at the point of sale would make a purchasing decision when they could choose between a product that has a benzene contamination and one that doesn't because that is a real true choice to purchase the one that does not. It's also very reasonable to say that they lost money because they overpaid, because that diminished the product's value. I think this is a very straightforward injury standard. I think it's straightforward under TransUnion. I think it's straightforward under the Ninth Circuit's guidance. And I don't see any reason for the court to deviate from what is well-settled precedence in this litigation. All right. Judge Gould, any questions? No. Thank you. Judge Gilman? All right. Thank you. Thank you. Thank you all for your presentations today. This matter will be submitted.
judges: Gilman, GOULD, MENDOZA